(113 App. Div. 260)

### DOWLER v. SWIFT & CO.

(Supreme Court, Appellate Division, First Department. May 11, 1906.)

1. SALES—CONTRACTS—EVIDENCE.

In an action on a contract, evidence held to show that certain goods were consigned to be sold by plaintiff as defendant's agent, and at defendant's risk, and not purchased absolutely by plaintiff.

2. FACTORS—QUESTIONS FOR JURY—NEGLIGENCE IN HANDLING GOODS.

In an action by a consignee of merchandise to recover from the consignor under an agreement to reimburse the consignee for any loss resulting from the handling of the goods, evidence held to require submission to the jury of the question whether the consignee was negligent in not inspecting the goods upon their arrival at port or afterwards.

3. SAME—CONSTRUCTION.

Where goods were consigned by defendant to plaintiff under an agreement that plaintiffs should sell the goods if possible, and in the event of not being able to get full value should cable the best price obtainable, it was not the duty of plaintiffs to give notice of the fact that they were unable to obtain any offer at all for the goods.

Appeal from Trial Term, New York County.

Action by Arthur E. Dowler against Swift & Co. From a judgment for defendant, plaintiff appeals. Reversed and remanded.

Argued before O'BRIEN, P. J., and PATTERSON, McLAUGHLIN, LAUGHLIN, and HOUGHTON, JJ.

Herman Aaron, for appellant.

Edward Swann, for respondent.

PATTERSON, J. At the trial of this action the court directed a verdict for the defendant, and from the judgment entered thereon, and from an order denying a motion for a new trial, the plaintiff appeals.

At the close of the proofs the defendant moved for a nonsuit, but no ruling was made upon that motion by the court, and hence we have only to consider the correctness of the course pursued by the trial justice in instructing the jury to find the verdict they rendered.

The plaintiff sued to recover a sum of money which he alleged his assignors, Arnhold, Karberg & Co., had advanced to the defendant corporation upon merchandise, namely 300 tierces of pickled beef shipped by the defendant to that firm at Shanghai in China. It is alleged in the complaint that the defendant requested Arnhold, Karberg & Co. to act as its agent in endeavoring to effect a sale or 300 tierces of beef at Shanghai, China, the merchandise to be consigned to them, and that the defendant requested the firm to advance upon the invoice or bill of lading of such beef the sum of $6,272.10, and promised and guarantied to and with the firm to repay said advance and make good any loss which the consignees might sustain by reason of the transaction; that Arnhold, Karberg & Co. did, pursuant to the request, advance the sum mentioned on or about November 28, 1900, and received the invoice or bill of lading of the beef, and promised and agreed with the defendant to act as its agent in the transaction; that the beef was consigned to, and was received by, the firm at Shanghai, which in and about the business of that agency was obliged to, and necessarily did, pay out sums of money on account of the defendant; that prior to the commencement of the action the beef was, at the request of the defendant, returned to it by shipment to America; that at the time of the commencement of the action there was a sum of $7,162.89 due from the defendant to plaintiff's assignor, which was demanded of the defendant, who refused and neglected to pay the same. The answer of the defendant contains a denial of all the allegations of the complaint except the formal ones relating to the copartnership of the plaintiff's assignors and the incorporation of the defendant, and then proceeds to set up affirmatively for a first defense that the plaintiff's assignors failed and neglected to perform their legal duties and obligations

to the defendant in and about the transaction set forth in the complaint, in that they failed and neglected to exercise skill, care, or diligence in protecting the goods from the known severe climatic conditions prevailing at their place of destination·in China, but, on the contrary, negligently allowed the goods to be exposed, so that they became damaged and unmarketable. They further set up that, as part of the contract between the plaintiff's assignors and the defendant, the former agreed that, if they could not sell the said goods for full value, they would promptly cable to the defendant the best price that could be obtained; that the goods arrived in China in due course on or about December 13, 1900, and remained there in the possession of the plaintiff's assignors, who failed and neglected to protect the same from the usual and natural deteriorating effects of the severe climatic conditions there prevailing, and failed and neglected to perform their express or implied obligations aforesaid to the defendant, and did not cable the defendant, or give it any notice whatever that they could not sell the goods for full value, or that such goods were being exposed or were becoming damaged, nor did they send notice of any nature or description, by cable or otherwise, to the defendant until June 5, 1901, at which time damage had been done, and the defendant could not do anything to protect itself from loss; that upon receiving the notice aforesaid it was agreed between the plaintiff's assignors and the defendant that the said goods should be returned from China, and sold by the defendant; "for the account of whom it may concern," without prejudice to either of the said parties; that, in accordance with such agreement, goods were thereafter reshipped from China to the United States, and sold by the defendant at the best price obtainable under the circumstances, after the use of due diligence; that the net amount of $1,326.60 was received therefor, which sum the defendant tendered to the plaintiff's assignors, and said tender was refused. For a second defense, it was alleged that the goods mentioned in the complaint were sold and delivered by the defendant to the plaintiff's assignors at a stipulated price of $6,272.10, with an agreement between the parties that, if the plaintiff's assignors with due diligence could not sell the goods at an amount equal to the agreed price, including freight, the defendant would refund to them the difference between such agreed price and the selling price, or the price obtained by plaintiff's assignors on a resale by them, and that the plaintiff's assignors simultaneously therewith on their part agreed that they would do their best to resell the goods promptly, and, in the event of their not being able to get the full value, that they "would cable to the defendant the best that could be done," and, in pursuance of such agreement, the defendant was paid and received $6,272.10, and at the same time shipped the goods to Shanghai, as directed by plaintiff's assignors; that such goods arrived in China on or about December 13, 1900; that the plaintiff's assignors failed to exercise reasonable care and diligence in endeavoring to sell said goods, and they negligently allowed the same to be exposed to the usual and natural deteriorating effects of the climate of Shanghai, without proper protection, without reselling the same at any price, and they failed and neglected to cable the defendant prompt

ly, or give the defendant any notice whatever within a reasonable time of their failure to make a resale, or of the condition of the goods, until June 5, 1901, at which time the goods had been seriously damaged by the climate and exposure, so that the same became unmarketable for the purposes for which they were intended. Then follows a restatement of the agreement as to the return of the goods to the United States, and their being sold to the best advantage, and the tender of the net amount of such sale to the plaintiff's assignors.

It may be remarked at the outset that no question has been raised of the want of diligence on the part of the plaintiff's assignors to sell the merchandise upon and after its arrival in China. It was conceded on argument that they did make every effort to sell. The application to the court for the direction of a verdict was placed specifically on the ground "of the negligence of Arnhold, Karberg & Co. in failing to inspect the goods upon their arrival in China, and for the failure on their part to perform the condition precedent in failing to notify Swift & Co., by cable, or promptly, or otherwise, that the goods had not been resold." In ruling upon this motion the court said:

"Assuming, without so deciding, that the transaction between the parties was that of a consignment, and not a sale of the goods in suit, it was nevertheless the duty of the plaintiff's assignors to inform the defendant of every fact in relation to their agency which came to their knowledge, and which might have been important for the defendant to know for the protection or for the promotion of their interests. The undisputed evidence shows that the plaintiff's assignors neglected to observe this duty, and that in consequence thereof the loss of the goods in question ensued, except to the extent of $1,326.60, that being the amount realized upon the sale of the remainder of the goods upon their return to this country. This sum, it is conceded, has been tendered to the plaintiff and refused."

What precise or particular duty the plaintiff's assignors failed to perform is not indicated, but by his ruling the trial judge, in effect, held that the plaintiff's assignors were liable for not giving prompt notice to the consignors, by cable or otherwise, that the goods had not been resold, and for not giving notice promptly that such goods were in bad condition, which would involve the performance of a prior duty to inspect the goods from time to time, to ascertain their actual condition.

We are unable on this record to find justification for this ruling. The contract made between the parties respecting this merchandise is contained in correspondence between the agent of Arnhold, Karberg & Co. at the city of New York and an agent of the defendant at Jersey City; but, in order that the relations established by that correspondence may be understood, it is necessary to advert to matters appearing on the trial without objection, and which occurred anterior to the correspondence, and which disclose the circumstances in which the ultimate agreement concerning the merchandise was made. In October, 1900, Arnhold, Karberg & Co. at Shanghai, in China, were negotiating a contract with the German government for the delivery of 300 tierces of beef, to be guarantied sound on arrival, for use by the German troops forming part of the allied forces then in China. That firm informed Mr. Dowler, its agent in New York, of the pending transaction, and thereafter Mr. Hudson, acting on behalf of the

defendant, made a proposal for a sale of the beef required by Arnhold, Karberg & Co., which proposal was accepted by Mr. Dowler, who cabled to Shanghai, saying that the order of the German government had been executed, and thereupon the Shanghai firm entered into a binding contract with that government. On the 16th day of October, 1900, Mr. Dowler wrote, in the name of Arnhold, Karberg & Co., a letter to the defendant, stating that they had accepted the offer made through Mr. Hudson of the sale of the 300 tierces of prime pickled beef, guarantied to be in sound condition on arrival in China, shipment to be made the next day. On the evening of October 16th Mr. Hudson saw Mr. Dowler, and stated that he (Hudson) had made a mistake; that he could not guaranty the sound condition of the beef on delivery in China. Mr. Dowler referred to the seriousness of the situation in which he was placed, but Hudson repeated that he could not deliver the beef; whereupon, in view of the urgency of the matter, Mr. Dowler, as he testifies, canceled the contract with Swift & Co., and its agent accepted the cancellation. In order to meet his foreign engagement as to 300 tierces of beef, Mr. Dowler bought that quantity from Armour & Co. It is not controverted that after the cancellation of the contract another arrangement was made concerning the 300 tierces of the Swift & Co. beef, and it is not denied that that new arrangement is correctly set forth in correspondence which took place between Dowler, writing in the name of Arnhold, Karberg & Co., and an authorized representative of the defendant. On the 17th of October, 1900, Arnhold, Karberg & Co., through Mr. Dowler, wrote two letters to the defendant, referring specifically to the cancellation of the first arrangement as made with Mr. Hudson, and at that point the matter seems to have been dropped until about the middle of November, 1900, when Mr. Lowe, a representative of the defendant, called upon Mr. Dowler, who testified that Lowe told him that a great mistake had been made; that it was not intended that the purchase should be canceled, but he remarked that that was all finished, "and the best thing we have to look out for is what to do with the three hundred tierces." He said (according to Mr. Dowler) that the goods were on the way to China, and asked whether Dowler would take charge of the 300 tierces, or endeavor to sell them for the account of Swift & Co., and Dowler responded that he would do so; that he would not only take the trouble to write about it, but would cable out. Mr. Lowe testified that he knew that Mr. Hudson, acting for the defendant, declined to carry out "the deal" made with Mr. Dowler, and that the firm in China had been put in a bad position by that refusal "to carry out a deal which had been distinctly made," and that he requested Mr. Dowler to cable to China, and see if he could not also place the 300 tierces that belonged to Swift & Co.; that Mr. Dowler informed him that he (Dowler) would sell the beef in China if he could; that he would take it if the defendant would guaranty the sale; that is, if it would guaranty Dowler's firm against loss. After the conversation between Lowe and Dowler last adverted to, Swift & Co. write to Arnhold, Karberg & Co. in New York the following letter:

"Dear Sirs: Inclosed we hand you invoice and B/L for 300 tcs. beef sold to you at $15,00 f. o. b. Chicago freight to be prepaid at $1.10 per hundred, amounting to $6,272.10. We fully appreciate your kindness in agreeing to take this beef, and pay for same, with a thorough understanding that you are to use every effort to place same without loss, but should you incur a loss we to make same good to you. Thanking you for the courtesy which you have extended to us through the whole affair, and regretting very much the errors which caused this not to be a positive sale, we remain,

"Yours respectfully,                    Swift & Co., Per S. B. L."

To this letter Arnhold, Karberg & Co. replied as follows:

"Dear Sirs: We beg to acknowledge receipt of your favor of the 16th inst., inclosing invoice for 300 tierces beef consigned to our Shanghai friends to sell for your account, and, in the event of there being any loss, it is understood that you agree to make same good to us promptly. We inclose you herewith our invoice showing the total value of the 300 tierces, plus charges at this end, as $6,356.98, and we now hand you our check for $6,272.10, being the amount of your invoice which we agreed to advance under your guaranty to make good any loss should any be sustained. Our firm will do their best to realize this lot promptly, and, in the event of their not being able to get full value, we shall cable you the best that can be done. Owing to your only handing us the bill of lading on the 16th inst., the day the steamer left the Pacific coast, we have had to get the S. S. Co. to cable their people to deliver the goods to us in Shanghai without documents, and we trust that no trouble will occur on this account. Requesting your kind acknowledgment, we remain,

"Yours very truly,                    Arnhold, Karberg & Co."

On November 30, 1900, Swift & Co., by Lowe, wrote the following letter to Arnhold, Karberg & Co:

"Dear Sirs: We are in receipt of yours of November 28th, inclosing your check for $6,272.10, covering our invoice of Nov. 15th for 300 tierces beef which we hope you will be enabled to sell without loss, so that it will be unnecessary to call on us to make the same good to you. Again thanking you for all courtesies extended, and hoping to have the pleasure of doing more business with you, which we assure you will be attended to in a better manner than this deal was, should we be so fortunate, we remain,

"Yours respectfully,                    Swift & Co., Per S. B. L."

It is to be observed that in the above correspondence Swift & Co., in the letter in which they inclosed the bill of lading refer to the transaction as not being a positive sale, and that in the letter of Arnhold, Karberg & Co., forwarding their check, they state that the goods were accepted for account of Swift & Co., and also that in the letter of Swift & Co. acknowledging receipt of the check there is no repudiation or question made of Arnhold, Karberg & Co.'s declaration that the goods were consigned for sale on account of Swift & Co. It sufficiently appears, therefore, that the relation established between the parties to the transaction was that of consignor and consignee; that Arnhold, Karberg & Co. assumed an agency to sell for Swift & Co. the 300 tierces of beef. The firm had nothing to do with shipping it to China. It was prepared for shipment and sent from Chicago to the Pacific coast and put on board the steamer bound for Shanghai by Swift & Co. But that corporation by error entered the transaction on its books as an actual sale made to Arnhold, Karberg & Co., and they so treated it.

It appears in evidence, and attention is called to the fact by both parties, that the merchandise arrived in Shanghai in good condition. On its arrival it was placed in a warehouse, which has been shown

to be a proper and sufficient place of deposit for the security or protection of that merchandise. There is nothing to show that it was not put in the warehouse as soon as conveniently and properly could be done after unloading, although it was not actually housed for several days. It arrived in Shanghai in December, 1900, which is the winter season in China. From that time and continuously thereafter there was no market for it. Its use in the army had been interdicted in consequence of the scurvy having broken out among the troops. As said before, every effort was made by Arnhold, Karberg & Co. to effect a sale, but without avail. The 300 tierces remained on hand until June, 1901, when the warehousemen informed Arnhold, Karberg & Co. that the beef had become putrid, and its condition was so offensive that it could no longer remain in the warehouse, and that it must be taken away. As soon as Arnhold, Karberg & Co. received that information, they imparted it, through their New York agent, by letter to Swift & Co. There happened to be at that time a representative of the defendant in China, who made a personal inspection of the merchandise, and ascertained that some 6 tierces were worthless and 97 others were affected and in bad condition. Thereupon some arrangement was made, after treatment had been given the beef, to return it to Swift & Co. in the United States, and in the middle of summer it was reshipped to America by way of the Suez Canal. It was thus in its then condition subjected to climatic influences during that summer transit. Upon arrival here, it was sold by Swift & Co. for a comparatively small amount of money. The evidence is convincing that in the summer the goods would naturally deteriorate in quality.

There is nothing in the evidence from which it can be held, as a clear legal conclusion, that it was incumbent upon the plaintiff's assignors to inspect the goods on their arrival in China by opening the packages and examining their contents. When they arrived, they were apparently in sound condition. The consignees did not by express agreement assume any duty of inspection, and the defendant failed to show facts which would devolve that duty on Arnhold, Karberg & Co. when the goods arrived. It is not shown that it was customary for consignees of such goods in China to inspect them on arrival, and in the state of the evidence, we are unable to see how it could be held, as matter of law, that the consignees were delinquent in not opening the packages when they arrived to ascertain the condition of the beef. If there were any negligence in this regard, it was a matter for the jury to determine under all the facts and circumstances appearing in evidence. Nor is it an inevitable conclusion of law that the consignees were negligent in the performance of duty because they did not from time to time inspect the goods when they were in the warehouse. Whether they should have done so or not is a matter of fact, also determinable from all the circumstances appearing in the evidence. Whether they did know, or should have known, that the merchandise would deteriorate and become spoiled, and should have made inspection from time to time, was a question for the consideration of the jury. The plaintiff gave evidence tending to show that his assignors had no knowledge of the inherent tendency

of goods of this description to become spoiled in hot weather; that they had not dealt in such goods. It was shown that, immediately the consignees were informed in June of the foul condition of merchandise, they notified the defendant, whose special agent in China then undertook to preserve it from further deterioration; and here again the evidence fails to establish what, if any, duty, by custom or otherwise, was imposed upon the consignees to examine the goods from time to time. They had contracted to do so. If it were part of the general duty of a consignee to make such periodical inspection, proof should have been given to that effect. At all events, the record is not in such a situation as to have authorized the court to hold that the consignees had failed in their duty by omitting such inspection. Nor was the evidence sufficient to authorize the trial court to direct a verdict for the defendant on the ground that the consignees had failed to give notice that they were unable to sell the merchandise. How it could become part of their legal duty to give notice of what they could not do is not apparent. What they undertook was to do their best to realize "on this lot promptly," and, in the event of not being able to get full value, to cable the best that could be done. Here the obligation was assumed to give information when a price could be obtained. The consignees were to make a continuous effort to sell the goods which were in their hands for that purpose, and they were making diligent efforts to effect a sale. Had a price been offered, and they failed to communicate it, there would have been reason for complaint; but, as no information was received at all, the defendant, if it had had regard to its contract with the consignees, would have known from the lack of such information that no price had been offered. And indeed it appears in evidence that if the defendant had kept in mind the agreement it actually made with the plaintiff's assignors, it would have instituted inquiries itself concerning the goods. It made the mistake of entering upon its books the transaction with Arnhold, Karberg & Co. as being an out and out sale, and therefore paid no further attention to the subject until advice was received of the spoiled condition of the merchandise. We do not find from the evidence that the plaintiff's assignors were under any duty whatever to inform the defendant that a sale or sales had not been made of the consigned property.

On the whole evidence, as it appears in the record, we are of the opinion that the trial judge erred in directing a verdict for the defendant.

The judgment and order appealed from should be reversed, and new trial ordered, with costs to the appellant to abide the event. All concur.